1

```
1
2                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF ILLINOIS
3
    RODNEY HEARD,              )      14-00905
4                             )
                              )
5            Plaintiffs,      )
                              )
6        Vs.                  )      East St. Louis, Illinois
                              )      November 2, 2015
7   NATHAN CHAPMAN, et al.,   )
                              )
8            Defendants,      )
9                    TRANSCRIPT OF PAVEY HEARING,
            BEFORE THE HONORABLE DONALD G. WILKERSON,
10                 UNITED STATES MAGISTRATE JUDGE.

11
    APPEARANCES:
12
    For the Plaintiffs:      Rodney Heard, N62922 (Pro Se)
13                           Pinckneyville Correctional Center
                             5835 State Route 154, Box 999
14                           Pinckneyville, IL  62274

15  For the Defendants:      Sandberg, Phoenix, et al.,
                             By:  Alexander B. Chosid
16                           600 Washington Avenue
                             15th Floor
17                           St. Louis, MO  63101

18                           Illinois Attorney General's Office
                             By:  Eric J. Bulman
19                           500 South Second Street
                             Springfield, IL  62706
20
    Court Reporter:          Barbara Kniepmann
21                           750 Missouri Avenue
                             East St. Louis, IL  62202
22
    Proceedings recorded by mechanical stenography, transcript
23  produced by computer.

24

25
```

1      (Whereupon the following proceedings were held in open

2  Court.)

3           THE COURT:  Okay, for the record, Mr. Heard, I can

4  see you.  Can you hear me?  Can you see me?

5           MR. HEARD:  Yes, Your Honor, I can see and hear you.

6           THE COURT:  Thank you.  For defendants we have?

7           MR. BULMAN:  Eric Bulman from the Attorney General's

8  office for Defendants Hess and Pierce, Your Honor.

9           THE COURT:  All right.  We also have a witness who is

10  going to testify and that is Warden Pierce, is that correct?

11           MR. BULMAN:  Both Defendants Hess and Pierce are

12  present.  Defendant Hess is at Pinckneyville with plaintiff

13  and Warden Pierce is at Pontiac.

14           THE COURT:  All right, very good.  So you are Warden

15  Pierce, is that correct?

16           WARDEN PIERCE:  Yes.

17           THE COURT:  Can you see me and hear me?

18           WARDEN PIERCE:  Yes, Your Honor.

19           THE COURT:  All right, very good.  Why don't we,

20  since we have witnesses waiting you intend to call, move that

21  chair and come on up.

22           Mr. Heard, this is the way we're going to conduct

23  this.  The defendant has a couple of witnesses.  The

24  defendants, and once we hear their testimony if you have any

25  questions, tell me what they are.  If they are relevant, I'll

1    ask them, okay.  You'll have an opportunity to ask questions,

2    but you can only ask relevant questions, so listen so you can

3    tell me what questions you want to ask and I'll ask the

4    witness if they are relevant, okay?

5         MR. HEARD:  Yes, Your Honor.

6         THE COURT:  Very good.  Hold on a moment.

7         All right, I apologize.  She brought to my attention

8    the other defendant's attorney is also present.

9         MR. CHOSID:  Sorry, Your Honor, Alex Chosid here for

10   the Wexford defendants today as it relates to Nurse Henrietta

11   Melvin.

12        THE COURT:  Right.  Now there is also an issue of

13   qualified immunity.  We are not taking that up today.  I just

14   want to make sure everybody understands we're just talking

15   about exhaustion today.  Okay, go ahead Mr. Bulman.  Let me

16   swear him in first.  Raise your right hand, Mr. Pierce.

17             GUY D. PIERCE, PLAINTIFF'S WITNESS, SWORN

18                      DIRECT EXAMINATION

19   Questions by Mr. Bulman:

20        THE COURT:  All right, very good.  State your name

21   and spell your last name for the court reporter.

22   A.    Guy D. Pierce, P I E R C E.

23        THE COURT:  All right, very good.  Mr. Bulman, go

24   ahead.

25   Q.    Mr. Pierce, what is your current job at Pontiac

4

1   Correctional Center?

2   A.     Currently the Assistant Warden of Operations at Pontiac

3   Correctional Center.

4   Q.     How long have you been the Assistant Warden of

5   Operations?

6   A.     For approximately two years.

7   Q.     Okay.  In 2011, what position did you have at Pontiac?

8   A.     I believe I was the Warden at that time.

9   Q.     Okay.  Mr. Pierce, could you provide a brief

10  description of the warden's job responsibilities?

11  A.     To oversee the daily functions of the facility, to

12  manage budget issues, to insure safety and security of the

13  facility, sign off on paperwork and insure policy versus

14  procedure is met.

15  Q.     Mr. Pierce, would you provide the Court with a brief

16  description of the extent of whatever medical training you

17  have had?

18  A.     I have had no medical training whatsoever.

19  Q.     Okay.  Would that include first aid, first response,

20  CPR, anything like that?

21  A.     Only thing I had as far as I have had the first

22  responder for CPR.  I have not had first aid.

23  Q.     Okay.  So Mr. Pierce, at any time would it have been

24  your job responsibility to set medical policies for Pontiac?

25  A.     No, sir.

1  Q.      Did you ever set a medical policy for Pontiac?

2  A.      No, sir.

3  Q.      So as warden, part of your job would be to review

4  grievances, correct?

5  A.      Yes, sir.

6  Q.      So if you came across a grievance that was complaining

7  of a particular medical policy, would you have any reason to

8  suspect that grievance was directed toward any action you have

9  taken?

10  A.      No, sir.

11  Q.      Would any counselor or anyone else have reason to

12  believe that grievance was about you?

13  A.      No, sir.

14          MR. BULMAN:   That will do it for my questions.

15          THE COURT:   All right.  Mr. Heard, you heard the

16  questions asked of Mr. Pierce.  Are there any questions you

17  want to ask Mr. Pierce?

18          MR. HEARD:   Yes, sir, I would.

19          THE COURT:   Tell me what it is.

20          MR. HEARD:   I would like to know what are his duties

21  again for warden.

22          THE COURT:   Okay, you didn't hear.  Could you repeat

23  the duties of a warden, Mr. Pierce, repeat that for us?

24  A.      To oversee the daily operations of the facilities, make

25  rounds, insure policy versus practice, sign off on paperwork

6

1    and insure that budget measures are in place.

2              THE COURT:  Okay.  Did you hear that Mr. Heard?

3              MR. HEARD:  Yes, I did, Your Honor.  I have another

4    question.  Are those policies regarding health care as well?

5    A.    No, the policies in health care, when it comes time for

6    policy in health care, they are set forth by the Office of

7    Health Services.

8              MR. HEARD:  You have three wardens at Pontiac, right?

9              THE COURT:  Hold on.  Are there three wardens at

10   Pontiac is the question.

11   A.    No, there is one warden and two assistant wardens.

12             THE COURT:  One warden, two assistants.

13             MR. HEARD:  What are the duties of the assistant

14   wardens?

15             THE COURT:  Tell me where you are going with this.

16   If you want to know is -- if where you are going is trying to

17   find out if any of the wardens set medical policy?  Is that

18   what you are trying to get to?

19             MR. HEARD:  Yes.

20             THE COURT:  Do either of the assistant wardens,

21   Mr. Pierce, are any of their duties to set the medical

22   policies?

23   A.    No, sir.

24             MR. HEARD:  Okay.  Again, I know you have said it,

25   but tell me again whose duty it is to set the medical policy.

7

1   A.     It is the Office of Health Services.

2          MR. HEARD:  Is that an office in the prison or is

3   that a statewide office?

4   A.     It is statewide office that sets policy for the Health

5   Care Unit.

6          THE COURT:  Okay, all right.  Mr. Heard, go ahead.

7          MR. HEARD:  Yes, sir.  Are there any wardens over

8   charge of the health care system?

9          THE COURT:  The office that sets the health care

10  policy, who do they report to?  Do you know?  If you know.

11  A.     They report to the Director's office.

12         MR. HEARD:  Okay, they report to the Director.  And

13  that is the Director of IDOC, correct?

14  A.     Correct.

15         THE COURT:  Okay, Mr. Heard?

16         MR. HEARD:  One moment, please.

17         THE COURT:  That's fine.

18         MR. HEARD:  What are the duties of the two assistant

19  wardens?

20         THE COURT:  As it relates to what?  He told you that.

21         MR. HEARD:  As it relates to the daily operations of

22  the institution.

23         THE COURT:  How is that relevant to what we're trying

24  to figure out.  The only thing we're doing today is trying to

25  figure out if you exhausted your administrative remedies here.

1    Nothing else.

2              MR. HEARD:  That's it?

3              THE COURT:  Yes, sir, nothing else.  How is that

4    relevant to that?

5              MR. HEARD:  I'll let that question go then, Your

6    Honor.  Did you get any grievances from Heard?

7              THE COURT:  Okay, Mr. Heard --

8              MR. HEARD:  When I was there.

9              THE COURT:  Mr. Pierce, do you recall getting any

10   grievances from Mr. Heard, Rodney Heard?

11   A.    Sir, there is grievances filed on a daily basis and

12   this is over four years ago.  I do not recall if I ever

13   received any grievances from Mr. Heard.

14             MR. HEARD:  That's it, Your Honor.

15             THE COURT:  All right, thank you.  Anything further

16   for this witness?

17             MR. BULMAN:  No, Your Honor.

18             THE COURT:  Thank you very much, Mr. Pierce.  You're

19   excused.

20             All right, who is your next witness, Mr. Bulman?

21             MR. BULMAN:  Officer Dave Hess, Your Honor.  Dave

22   Hess is the defendant.

23             THE COURT:  There is no Motion for Summary Judgment

24   filed by Hess?

25             MR. BULMAN:  No, he was on qualified immunity, but

9

1    one of plaintiff's arguments in his response for Motion for

2    Summary Judgment --

3            THE COURT:  Come up here so he can hear you.

4            MR. BULMAN:  Dave Hess filed Motion for Summary

5    Judgment on Qualified Immunity, which we're not covering

6    today, but plaintiff's response to our Motion for Summary

7    Judgment on Exhaustion as to Pierce was that Mr. Hess did not

8    provide plaintiff with a grievance form and that prevented

9    plaintiff from exhausting as to Pierce.

10           THE COURT:  Yes, that's true.  That is your argument.

11   All right, I'll hear from him about that.

12           MR. BULMAN:  Mr. Hess should be in the room with you,

13   Mr. Heard, correct?

14           MR. HEARD:  Yes, sir.

15           THE COURT:  Can we get the camera swung over to

16   Mr. Hess?  Do they need to move you?  Hold on, we'll swing the

17   camera.  All right, very good.  We got it all right.  Raise

18   your right hand, sir.

19              DAVID HESS, PLAINTIFF'S WITNESS, SWORN

20                      DIRECT EXAMINATION

21   Questions by Mr. Bulman:

22           COURTROOM CLERK:  State your name and spell your last

23   name for the court reporter, please.

24   A.     Correctional Officer David Hess, H E S S.

25           MR. BULMAN:  Thank you, Your Honor.

1   Q.     Mr. Hess, you are currently not a correctional

2   counselor, correct?

3   A.     That's correct.

4   Q.     When were you a correctional counselor?

5   A.     I have been a correctional counselor off and on at

6   Pinckneyville since 2011, that would be October of 2011, and I

7   ended my tour of duty in March of 2015.

8   Q.     Okay.

9   A.     But I been both officer and correctional officer during

10  that time.

11  Q.     Do you recall if you were ever Plaintiff Rodney Heard's

12  counselor?

13  A.     Yes, I do.

14  Q.     You recall that you were, correct?

15  A.     Yes, I do.

16  Q.     Okay.  Do you recall ever having a conversation with

17  Mr. Heard in August of 2012 about his complaints about seeing

18  a dentist?

19  A.     Vaguely, yes.

20  Q.     Do you recall what was said during that conversation?

21  A.     At the time Mr. Heard was wanting to file a grievance

22  against the current dentist that was here at Pinckneyville.

23  This is before Mr. Chapman had started his tour of duty here.

24  A previous assistant warden requested that the counselors

25  speak personally with inmates on the wing prior to the

11

1    grievance procedure initiating in an attempt to resolve the

2    grievance at the lowest level possible if they could be and if

3    not assist the inmate by giving him grievances and maybe

4    giving him some sort of guidance as to how to proceed.

5    Q.    Okay.  Do you recall whether or not you gave plaintiff

6    a grievance in August of 2012?

7    A.    During our initial conversation when he first presented

8    himself, I did not because I thought that I had given him the

9    information that he needed, but as you can see, you may or may

10   not be able to see through my counseling notes, I had gave him

11   grievances at a later date.

12   Q.    Okay.  And at any time did you try to prevent plaintiff

13   from filing grievances?

14   A.    They have a right to file a grievance any time they

15   want.

16          MR. BULMAN:  Okay.  I have no further questions.

17          THE COURT:  All right, thank you.  Swing back over to

18   Mr. Heard.

19          All right, Mr. Heard, you heard what Mr. Hess

20   testified to.  Is there anything you want to ask of him?  Tell

21   me what the question is.

22          MR. HEARD:  Just a second, Your Honor, I am trying to

23   find the pertinent document.

24          THE COURT:  All right.  Okay, tell me what your

25   question is.

12

1        MR. HEARD:  My question is pertaining to a

2   communicative counseling summary.  I think that Mr. Hess just

3   spoke of this.  I would like to know, where does it say he

4   gave me grievances, before or after the conversation that we

5   had?

6        THE COURT:  All right.  We'll swing back over to

7   Mr. Hess.

8        MR. HEARD:  Can I give him the document?

9        THE COURT:  No, hold on.  Not yet.

10        Mr. Hess, do you have a copy of that?

11   A.     Negative, sir.

12        THE COURT:  I just want to know if you got a copy of

13   the document.

14   A.     No, I do not.

15        THE COURT:  Why don't you hand it over to him, and

16   yeah, hand it over to Mr. Hess.  Mr. Hess, do you recognize

17   that as your portion or a portion of your counseling summary

18   for Mr. Heard?

19   A.     Yes.

20        THE COURT:  Okay.  Can you tell from that document

21   that he has handed you what dates it covers?

22   A.     It looks like March 3rd of 2013 through March 2nd of

23   2012.  That is in reverse order.

24        THE COURT:  So approximately a year from March 12th

25   to March 13th?

13

1    A.    Yes.

2         THE COURT:  Okay.  And the question is, is there

3    anywhere in the cumulative counseling summary that indicates

4    you gave him a grievance form is his question.

5    A.    They would not necessarily be indicated on this form,

6    sir.

7         THE COURT:  Hold on.  You will get an opportunity to

8    explain, but the question on the floor is, is there any?

9    A.    Not on this.  Not on this.

10        THE COURT:  All right, very good, the answer is not

11   on that.  Mr. Heard, any other questions you got for this

12   officer?

13        MR. HEARD:  Yes, there is.  During the time that we

14   had this conversation was around August.  Was defendant having

15   the dentist then?

16        THE COURT:  All right, so the question becomes --

17        MR. HEARD:  It was August of 2012.

18        THE COURT:  Hold on, hold on everybody.  Hold on.

19   Okay, Mr. Heard, listen to me.  The first thing that -- I am

20   going to try to help you get the information that you want,

21   okay, but you are going to have to bear with me.  The first

22   thing you said is August of 2012.  The first thing -- the

23   first thing I have to ask this witness is, do you remember

24   having a conversation with Mr. Heard in August of 2012 about

25   the dentist.

14

1      MR. HEARD:  Yes, sir.  He already gave testimony to

2  this.

3      THE COURT:  Hold on.  You don't get to do this.  You

4  get to ask a question.  Do you recall that, Mr. Hess?

5  A.    Yes, sir, vaguely I recall talking to Mr. Heard about

6  the dentist.

7      THE COURT:  Okay.  Are you aware of who was the

8  dentist at Menard at that time?

9  A.    Actually, sir, we're at Pinckneyville.

10     THE COURT:  I apologize.  I talk to a lot of prisons.

11 A.    At the time, sir, we had a dentist and it escapes me

12 what the dentist's name was prior to Dentist Chapman taking

13 over for his tour of duty here.  So I know we were in

14 transition, but at the time I believe it was -- I do not

15 believe it was Nathan Chapman, but it has been four years ago.

16     THE COURT:  All right, he is not exactly sure,

17 Mr. Heard, who the dentist was at that time.  What is your

18 next question?

19     MR. HEARD:  I am exactly sure the dentist was Chapman

20 because my medical records show when I was transferred.

21     THE COURT:  Hold on.  Listen.  I will let you make a

22 little argument.  That is not what we're doing right now.

23 Right now we're only asking if you have any questions for

24 Officer Hess.  That is all we're doing.  I am going to let you

25 talk to me later.  Any other questions for Officer Hess?

15

1       MR. HEARD:  When the inmate asks you for a grievance,

2   is it your job to give him one?

3       THE COURT:  All right, I'll ask that, but he has

4   answered that.  When an inmate asks you for a grievance,

5   officer, is it your job to give him one, a form?

6   A.      Are you asking me as an officer or temporarily assigned

7   counselor at that time?

8       THE COURT:  Well, both as counselor and then as an

9   officer.  As a counselor, is it your job?

10  A.      As a temporarily assigned counselor at that time, the

11  Assistant Warden of Programs, who we reported directly to,

12  asked us to try to resolve any potential grievances at the

13  lowest possible --

14      THE COURT:  I got that.

15  A.      Yes, which he asked if we could resolve it without

16  using the grievance process, we attempted to.  If we could

17  not, we gave the inmates grievances.

18      THE COURT:  That is all I am asking.  I got you

19  saying you want to resolve it if you can, but if you can't --

20  A.      Yes, sir.

21      THE COURT:  There we go.  It is your job to give him

22  a form.  What about as an officer?

23  A.      Negative, sir.  All of the grievances and things like

24  that at this institution come through the counselor.

25      THE COURT:  All right, very good, that was my

16

1   question.  Mr. Heard, any other questions?

2          MR. HEARD:  I would like to know if Mr. Hess

3   remembers what he told me that resolved it, he thought

4   resolved the situation that day.

5          THE COURT:  Okay, that is fair.  Mr. Hess, do you

6   remember anything about the conversation that you thought

7   resolved the issue?

8   A.     Sir, that has been too long ago.

9          THE COURT:  So the answer is negative, correct?

10  A.     Negative, sir.

11         THE COURT:  All right.  He doesn't remember.

12         MR. HEARD:  That's all I have for the witness.

13         THE COURT:  All right, thank you.  You are excused.

14  I am sorry, wait.  Wait, he gets an opportunity.  Come on up,

15  Mr. Bulman.  My bad.

16                    REDIRECT EXAMINATION

17  Questions by Mr. Bulman:

18  Q.     One more question for you, Officer Hess.  Would it

19  always be recorded if you gave an inmate a grievance form on

20  the counseling summary?

21  A.     Negative, sir.

22  Q.     Okay.

23  A.     Do you want me -- did I explain the procedures?

24  Q.     I don't think you did, but go ahead.

25  A.     Would it be pertinent to explain this?

17

1   Q.      Please do.

2   A.      Okay.  The aforementioned Assistant Warden of Programs,

3   part of our duties was to hold "day room", which means that we

4   go on to the wings where we're provided a desk to sit and talk

5   with inmates on the wing and to give forms and to talk issues.

6   We do that.  We're required to do it by regulation once every

7   60 days to make contact with an inmate.  If you go through my

8   counselor notes, you will see I have spoken with Mr. Heard

9   more than once every 60 days.  That was just courtesy I did to

10  the inmates that were on my case load.  You record the

11  significant events like you mentioned before, good conduct

12  credit restoration.  Mr. Heard had one of those, which I

13  processed for him.  There are some forms that you would record

14  on there as -- like you said something earlier about the trust

15  fund.  They are only allowed to have that once every 30 days.

16  Things like that you would record.  You would record that

17  contact.  If they had an attorney phone call, you would record

18  that contact.  Only significant events.  The normal process of

19  handing out money vouchers, inmate request slips, grievances,

20  requests for health care, you know, we have a little

21  preprinted request for health care you can give the inmates.

22  We have a little preprinted form you do if they are attempting

23  to get notary services or get to go to the law library.  These

24  things, if we put them in the computer, we flood the system.

25  They are not something that necessarily would be recorded in

1    the entries.  You only hit the highlights and things like DCC,

2    which is good conduct restoration, if you screen them for work

3    release, if you screen them for what is now called SSC.  Only

4    the highlighted things, big things, would you necessarily

5    record in there.  The day to day minutia type stuff you would

6    not record.  The system just couldn't handle everyday

7    conversation type things.

8    Q.    You mentioned how they are only allowed to have certain

9    I guess like significant documents you said, such as trust

10   fund account only 30 days you said.  How do you determine

11   which events are significant, which events are not

12   significant?

13   A.    That would come through the training.  Pardon me, I had

14   to return the keys.  That would be through the training that

15   you received when it became, in my case, temporarily assigned

16   as counselor.  They give you an add on to say enter these

17   things.  The day to day things like handing out forms do not

18   necessarily have to be recorded.

19            MR. BULMAN:  That will do it for my questions.  Thank

20   you.

21            THE COURT:  Any other questions, Mr. Heard?

22            MR. HEARD:  No, sir.

23            THE COURT:  Thank you, Officer Hess.  You are

24   excused.  I didn't ask you if you wanted to ask any questions.

25            MR. CHOSID:  I don't have anything, Your Honor.

19

1          THE COURT:  Mr. Bulman, any other witnesses you have

2    today?

3          MR. BULMAN:  No witnesses, Your Honor, but I do have

4    a copy of plaintiff's cumulative counseling summary.  We

5    turned it over to plaintiff as part of discovery.

6          THE COURT:  Hold it for argument if you want to make

7    argument.

8          MR. BULMAN:  I have an extra copy.  We didn't attach

9    it with our Motion for Summary Judgment.  We didn't believe it

10   was supportive of any argument we were making, but I want to

11   provide the Court with a courtesy copy.

12         THE COURT:  Hold on.  I'll get it in a second.

13   Anything you wish to present today?

14         MR. CHOSID:  Yes, Your Honor.  No witnesses, just

15   argument.

16         THE COURT:  Argument, very good.  Here is what we're

17   going to do.  I am going to hear from the lawyers and then

18   hear from you.  Listen to what they say.  This is your

19   opportunity.  You started to tell me some stuff before.  This

20   is going to be your opportunity, okay?

21         MR. HEARD:  Yes, sir.

22         THE COURT:  All right, very good.  Come on up

23   Mr. Bulman.

24         MR. BULMAN:  Would I be able to ask plaintiff a few

25   questions?

20

1          THE COURT:  Well --

2          MR. BULMAN:  Otherwise, I can work --

3          THE COURT:  Hold on.  Let me ask you a question.  All

4   right, I'm not going to swear him.  Ask him through me.  What

5   is your first question?

6          MR. BULMAN:  I want to ask plaintiff if he recalled

7   when he transferred from Pontiac to Pinckneyville.

8          THE COURT:  Do you remember, Mr. Heard, when you went

9   from Pontiac to Pinckneyville?

10          MR. HEARD:  I came from Pontiac -- I believe it was

11   October 19th.

12          THE COURT:  Of?

13          MR. HEARD:  Of 2011.

14          THE COURT:  Watch your hand in front of your mouth.

15   You are muffling.

16          MR. HEARD:  I am sorry about that.  Bad habit.

17          THE COURT:  I understand your issues.  I got you.  It

18   is okay, but I have a hard time if you are muffling what you

19   are saying.

20          MR. HEARD:  I forgot.  I am sorry.  I believe it was

21   October 19th of 2011.

22          THE COURT:  Got it.

23          MR. HEARD:  10-19-2011.

24          THE COURT:  Got it.

25          MR. BULMAN:  That's all I wanted.  Thank you.

1          Argument, Your Honor, as to Assistant Warden Pierce?

2          As we stated in our motion, plaintiff has completely

3     failed to identify any potential wrongdoing that Pierce might

4     be responsible for and Assistant Warden Pierce testified he

5     was not responsible for any setting of medical policy and he

6     testified that any medical policy would be set through the

7     statewide health care, I forget the exact term he used, but

8     the health care decision makers for all of IDOC.  So the

9     grievances where plaintiff has that are grieving any sort of

10    medical policy, which is what he is suing Pierce for, it would

11    not address, and no one would think that it would address him.

12    Based on that, we believe the plaintiff has failed to exhaust

13    any grievance against Defendant Pierce because it doesn't

14    identify any actions he would do.

15         We also made an argument based on timeliness for

16    plaintiff's grievances.  Plaintiff left Pontiac, he said

17    around October 19th of 2011.  He did not begin grieving these

18    medical policies until February 21st of 2013.  Even if we were

19    to believe plaintiff that Defendant Hess was preventing him

20    from grieving these issues, I believe Defendant Hess said he

21    was not a counselor until October of 2011 and plaintiff's

22    cumulative counseling summary will show that plaintiff did not

23    have his first recorded meeting with Defendant Hess was in

24    September 5th of 2012, ten months, about ten months after

25    plaintiff transferred from Pinckneyville to -- transferred

22

1    from Pontiac to Pinckneyville, and so which is well beyond the

2    60 day requirement in the grievance process.

3            THE COURT:  That is not what I took from what he

4    said.  What I took from what he said was he didn't -- and

5    we've been trying to glean what Mr. Heard has said in his

6    responses and basically what I heard him say in his responses

7    was he didn't find out that he was even eligible for this

8    surgery until he got to Pinckneyville.  He didn't say he found

9    out about it as soon as he got to Pinckneyville.  Now what is

10   not clear maybe is when he figured it out once he got to

11   Pinckneyville, but that's what he said.  He didn't say I got

12   to Pinckneyville and then I knew it.  He said when he got to

13   Pinckneyville and he saw the doctor, then he found out he was

14   eligible for this surgery and that according to him they lied

15   to him at Pontiac.  That is what I kind of got from what he

16   wrote.  Is that a fair recitation, Mr. Heard, of what you

17   said?

18           MR. HEARD:  Yes, it is, Your Honor.

19           THE COURT:  Okay.  All right.  So I mean even -- he

20   didn't say he learned of it immediately upon getting to

21   Pontiac.  I am saying even if he saw this counselor nine or

22   ten months later, I don't know exactly when he found out or

23   when this lie came to -- I am using lie because that is what

24   he is alleging is that he was told an untruth at Pontiac.

25           MR. BULMAN:  All right, I understand.  Would I be

23

1   able to then ask plaintiff about when he found out?

2       THE COURT:  I'll be happy to.  Mr. Heard, when you

3   got to Pinckneyville, how did you find out that you were

4   eligible for this surgery?

5       MR. HEARD:  I found out when I went on a writ to see

6   the specialist that does the jaw work for me.  Another inmate

7   went on that writ with me and he had a salivary duct stone

8   that he had to get removed.

9       THE COURT:  Do you remember when that was?

10      MR. HEARD:  No, I don't remember when it was and I

11  also found out beforehand, before this, I found out too that

12  when I talked to -- when I first talked to the specialist, Dr.

13  Swanson, I told him what was going on, that they told me was

14  salivary duct stone, they didn't do surgery on it.  He told me

15  himself they send guys for that all the time.

16      THE COURT:  All right.  So his medical records will

17  show when he saw that doctor.  I don't know exactly when this

18  is.  Go ahead, Mr. Bulman.

19      MR. HEARD:  Excuse me, Your Honor.  Defendant Chapman

20  also told me the same thing, they send people out for salivary

21  duct stone and he is the dentist here at Pinckneyville.

22      THE COURT:  Okay.  All right.

23      MR. BULMAN:  Well then to also address plaintiff's

24  argument in his response that has prevented him from

25  exhausting as to Pierce, as we heard from Defendant Hess, that

24

1    was not the case.  The counselors at that time were attempting

2    to resolve issues informally first and plaintiff, when he

3    requested a grievance form, would have obtained one as

4    defendant had testified to.

5          So far as the exact timing as to when plaintiff saw

6    Dr. Swanson, I note plaintiff just testified that he didn't

7    have a specific date, but since it is a key question, I would

8    like to dig a bit further as to if he has any recollection at

9    all as to how long he was at Pinckneyville before he saw Dr.

10   Swanson and learned this information.

11         THE COURT:  Any recollection, Mr. Heard, of how long

12   you were there before you got sent out?

13         MR. HEARD:  I got sent out February of 2013.

14         THE COURT:  Okay, February of 2013.

15         MR. BULMAN:  Okay.  And then, Mr. Heard, I don't know

16   if you have in front of you Document 57, your proposed new

17   complaint, paragraph 21.  Do you have that with you?

18         MR. HEARD:  Give me a second to find it.

19         THE COURT:  What is the relevance of this document?

20         MR. BULMAN:  Paragraph 21, plaintiff called to dental

21   on February 18th of 2013 by defendant Dr. Chapman.  That would

22   help establish the time line.

23         THE COURT:  He already said February of 2013, so

24   document -- what did you say?

25         MR. BULMAN:  Document 57, Your Honor.

25

1          THE COURT:  Amended Complaint.  I mean that is

2     consistent.

3          MR. BULMAN:  Yes.

4          THE COURT:  Okay.

5          MR. HEARD:  Do I need to find it?

6          Mr. Bulman:  No.  So that would have been then after

7     you saw Defendant Hess, is that correct?

8          MR. HEARD:  Yes, it would.

9          MR. BULMAN:  All right.  Well then, to close, the

10    thrust of defendant's argument, therefore, is that there is

11    just simply failure to identify any wrongdoing that Defendant

12    Pierce was responsible for or could have been responsible for,

13    therefore, plaintiff has failed to exhaust.  Thank you.

14         THE COURT:  All right.  What about nurse -- come on

15    up.  Tell me about nurse -- there is a nurse and counselor

16    Melvin in the documents.

17         MR. CHOSID:  That's correct, Your Honor.  We have a

18    lot of people with the same names floating around here.

19         THE COURT:  Do they have a relationship, any familial

20    relationship?

21         MR. CHOSID:  I have not delved into that.  I am not

22    sure, Your Honor.

23         THE COURT:  Very good.  Go ahead.

24         MR. CHOSID:  In the document we were just talking

25    about, his amended complaint, Doc 57, he references Nurse

26

 1    Henrietta Melvin as being deliberately indifferent by failing

 2    to give him gauze for dry socket and failing to give him a

 3    soft diet.  In the grievances that are attached to the various

 4    documents that I am looking at, attachment 4 to 494, Mr. Heard

 5    refers to Counselor Melvin as being a person he talks to about

 6    these issues, stating that he doesn't have his gauze, doesn't

 7    have soft diet.  But in none of the grievances does he address

 8    either Nurse Melvin or the fact that the soft diet or the

 9    gauze were denied by any nurse.  The only Melvin mentioned in

10    any of it is Counselor Melvin, which if you look at the dates

11    and cross reference them, it does reflect that he saw

12    Counselor Melvin on the date he is speaking of.

13         THE COURT:  Right.  I guess, and I noted the same

14    thing you did.  All right.  But I am going to direct you to

15    49-4 because that is the document you were talking about and

16    that is the grievances dated March 16th of 2013 and best case

17    scenario for Mr. Heard is this statement right here that is on

18    the middle of page two that says Counselor Melvin came to my

19    cell on 3 -- I believe it is 3-8-13.  Says Friday.  I told

20    Counselor Melvin that the area where I had had oral surgery

21    on, and I believe it is 3-6-13, was still bleeding.  Counselor

22    Melvin said that I needed to keep the gauze in.  I told, and I

23    don't know if that is her or him.  I think that is a her.  I

24    told her that I don't have any and that I didn't get any when

25    I was released from Health Care on 3-9-13.

27

1          I mean as far as the gauze is concerned, that is the

2    statement and the question becomes, is that sufficient to put

3    the prison on notice.

4          MR. CHOSID:  And Your Honor, my argument would be no,

5    it doesn't direct to a specific individual stating a nurse or

6    someone in the dental unit or any specific person in general.

7    All this grievance does is I don't have any gauze, I talked to

8    Counselor Melvin about it.

9          THE COURT:  Well, no, he says Health Care Unit.  He

10   says when I left the Health Care Unit and he gives the date,

11   they didn't give me any.  So I kind of disagree with you that

12   he is not putting anybody on notice.  Now, is it enough to put

13   your client on notice becomes the issue.  He states Health

14   Care Unit.  He states the date and what did or didn't happen

15   to him.  So you know, I mean there is an argument to be made

16   that -- I don't know how big the Health Care Unit is at

17   Pontiac or Pinckneyville we're talking about now?

18         MR. CHOSID:  This is at Pinckneyville, Your Honor.

19         THE COURT:  I don't know how big it is, but on March,

20   the date of March 8th or 9th, whatever date he said he left

21   the Health Care Unit, there shouldn't have been 20 people in

22   the Health Care Unit working, would there?  Is it that big?

23         MR. CHOSID:  It is important to know at Pinckneyville

24   I know the Health Care Unit and Dental Unit are separate and

25   Nurse Melvin works in the dental area, so there is some

28

1    important disambiguation in the way the plaintiff has written

2    this that I don't think puts the Dental Unit appropriately on

3    notice of these complaints.

4            THE COURT:  All right, that is a fair argument.  I

5    just --

6            MR. CHOSID:  I understand your reservations, Your

7    Honor.

8            THE COURT:  Yeah, I'll hear what Mr. Heard has to say

9    about it.  Anything else?

10           MR. CHOSID:  No, Your Honor, that is all I have.

11           THE COURT:  All right, very good.

12           You understand that, Mr. Heard, that the argument is

13   you didn't ever put in these grievances that this nurse denied

14   you and you didn't grieve and give the institution enough

15   notice to know what you were complaining about?

16           MR. HEARD:  Henrietta Melvin was the head of the

17   infirmary that day.  When I was in the pharmacy she was charge

18   nurse of the infirmary.  So she went to Dr. Chapman and asked

19   Dr. Chapman, cause he released me, and when she came back she

20   said okay, Dr. Chapman released you.  I went back to my unit.

21   I didn't get no gauze.  I didn't get nothing.  I didn't know

22   who was supposed to give me the gauze.  That is why I don't

23   have nobody name.  All I can say, hey, I didn't get the gauze

24   when I was released from health care cause I found out through

25   Kathy Melvin, who is the counselor, that I was supposed to

1    have it.

2          THE COURT:  And Henrietta Melvin, as far as you know,

3    Henrietta Melvin was the person who was in charge of the

4    infirmary and she was the person that released you from the

5    infirmary, is that correct?

6          MR. HEARD:  Yes, she was the person that released me

7    from the infirmary and I found out this through my Motion to

8    Compel and that is what they gave me and told me that she was

9    the charge nurse for the infirmary that day.

10         THE COURT:  All right.

11         MR. HEARD:  Not the dental department.

12         THE COURT:  Anything else you want to tell me, now is

13   your time.

14         MR. HEARD:  The other part, as far as her being I

15   think for the soft diet, is that I never talked to her.  In my

16   grievance there is a CO Preston who talked to her on the phone

17   about my diet tray.  I came to CO Preston in my cell.  He was

18   coming around delivering trays.  I told him I'm supposed to

19   get soft diet, I just had surgery.  She said I'll call Health

20   Care and check on that.  She called them and she came back,

21   told me you had a liquid diet for one day while you was in

22   Health Care, you don't get no other diet, so I filed a

23   grievance saying that what CO Preston tell me and once again I

24   found out through the Motion to Compel Henrietta Melvin was

25   the one that she talked to.

1        THE COURT:  All right.  Anything else gentlemen?  I

2   think that is it.  I think I have enough.  Let me take a quick

3   look at my notes and see.

4        MR. HEARD:  And I think we talked about -- excuse me,

5   Your Honor.  We were talking about Guy Pierce.  I didn't know

6   that I had, like they lied to me telling me that I had a duct

7   stone and I couldn't get surgery for, so they transferred me

8   to here in Pinckneyville.  I put in four requests to try to

9   get to see the dentist.  Every time it swelled up on me, every

10  two months, letting him know I have a duct stone, it is

11  painful, it is swelling up on me and I did that for like four

12  times, and then that is when I went to talk to Counselor Hess

13  and told him about it and asked him for a grievance and when I

14  asked, I didn't know to talk to him, I went to ask for

15  grievance.  I was tired.  I was going to file grievance on it.

16  Hess told me, he said, hey, it takes a year to see the

17  dentist.  You ain't been down here a year.  At the time that I

18  came down here, my medical records showed that Dr. Chapman was

19  the dentist cause he checked out my medical records and signed

20  it.  He seen my recommendation the next day that I came here.

21  I came 10-19-2011.  He checked out my medical records on

22  10-19, 10-20-2011, and signed it with his name, Chapman.  That

23  is how I know he was the dentist here.

24        And Dr. Hess is speaking of a modified grievance

25  system where I had to come to the warden, told him to handle

```
 1    that business right there, so that is modified grievance

 2    system right there, so if he took care, he thought he took

 3    care of the grievances, I would think my grievance would be

 4    exhausted right there.  He said he took care of it on that

 5    level, there wasn't no need for me to go to another level.  He

 6    was wrong in that.  He said it takes a whole year to see a

 7    dentist because there is only one dentist back there.  That is

 8    it for me, Your Honor.

 9              THE COURT:  All right, thank you.

10              MR. HEARD:  Thank you.

11              THE COURT:  Hold on, Mr. Heard.  Mr. Bulman, anything

12    else?  I'll accept the document, cumulative counseling

13    summary.  I'll accept that.

14              MR. BULMAN:  Nothing further, Your Honor.

15              THE COURT:  Anything else?

16              MR. CHOSID:  Your Honor, just very briefly.

17              THE COURT:  Come up here so he can hear you.

18              MR. CHOSID:  Very briefly, Your Honor.  I don't want

19    to belabor any more than we have.  Plaintiff gave us a number

20    of additional factual information regarding who he spoke to,

21    when he spoke to them.  None of that information is reflected

22    in the grievance.  It doesn't give the facility appropriate

23    notice that Mr. Heard could have said the infirmary nurse

24    discharged me or some general description as the code

25    requires.
```

32

1        THE COURT:  That is not what he said now.  He said he

2   only found out once he started this lawsuit who was in charge

3   of the infirmary and he got that information on the Motion to

4   Compel.  He didn't say that he knew it was the infirmary

5   nurse.  He said he only got that information once he started

6   this lawsuit.  Isn't that what you said?

7        MR. HEARD:  Yes, Your Honor.

8        THE COURT:  All right.

9        MR. CHOSID:  Your Honor, I don't think that terribly

10  changes my argument, however, in that he could have said any

11  given individual at health care.  All he really alleges is I

12  don't have gauze, I learned I was supposed to have gauze and

13  that doesn't give the facility or my clients the appropriate

14  notice of who Mr. Heard is talking about.

15       THE COURT:  I understand.  All right, thank you.

16       Mr. Heard, we'll try to get you an order out as

17  quickly as we can.

18       Court is in recess.

19

20

21

22   (Court is adjourned.)

23

    I certify that the foregoing is a correct transcript from the
24  record of proceedings in the above-entitled matter.

25  SS/Barbara Kniepmann                    January 13, 2015