# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

RODNEY HEARD,            )
                                   )
            Plaintiff,     )
                                   )
vs.                          )     Case No. 3:14-CV-905-NJR-DGW
                                   )
NATHAN CHAPMAN, VIPIN SHAH,  )
DAVE HESS, DR. ANDREW TILDEN,  )
and DR. J.W. MITCHELL,      )
                                   )
            Defendants.   )

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

This matter is before the Court on Motions for Summary Judgment filed by Defendant David Hess (Doc. 136) and Defendants Dr. Vipin Shah, Dr. Nathan Chapman, Dr. Andrew Tilden, and Dr. J.W. Mitchell (Doc. 143).[1] For the reasons set forth below, Defendant Hess's motion is denied, and Defendants Shah, Chapman, Tilden, and Mitchell's motion is granted in part, denied in part, and found moot in part.

### INTRODUCTION

Plaintiff Rodney Heard, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), filed this lawsuit on August 18, 2014, pursuant to 42 U.S.C. § 1983, alleging his constitutional rights were violated while he was incarcerated at

---

[1] The motion for summary judgment was also filed on behalf of Defendant Deb Bullock (*see* Doc. 143). However, Bullock was dismissed without prejudice as a defendant in this action on December 20, 2016 (Doc. 152). Accordingly, the motion for summary judgment as it pertains to Deb Bullock is moot, and the Court will not consider any arguments related to her.

Pontiac Correctional Center ("Pontiac") and Pinckneyville Correctional Center ("Pinckneyville"). In particular, Heard's complaint alleges that he was denied adequate dental care while incarcerated at Pontiac and Pinckneyville, which caused him to develop a tumor in his jaw and led to the removal of four lower right teeth and a portion of his jaw bone.

Pursuant to his amended complaint, Heard was proceeding in this action on a claim of deliberate indifference against Dr. Nathan Chapman, a dentist at Pinckneyville; Dr. Vipin Shah, the medical director at Pinckneyville; David Hess, a counselor at Pinckneyville; Henrietta Melvin and Deb Bullock, nurses at Pinckneyville; as well as Guy Pierce, the warden at Pontiac; Dr. Andrew Tilden, the medical director at Pontiac; and Dr. J.W. Mitchell, a dentist at Pontiac (*see* Docs. 55 and 57). Warden Pierce, Nurse Melvin, and Nurse Bullock have been dismissed without prejudice from this matter (Docs. 111, 152). Thus, as this matter currently stands, Heard is proceeding on a deliberate indifference claim against Defendants Dr. Chapman, Dr. Shah, Counselor Hess, Dr. Tilden, and Dr. Mitchell for failing to provide adequate dental and medical treatment to address the tumor in his jaw and against Dr. Shah for failing to adequately treat his gynecomastia. All remaining defendants have moved for summary judgment (Docs. 136, 143).

### FACTUAL BACKGROUND

As mentioned above, Heard was an IDOC inmate at all times relevant to his complaint (*see* Doc. 141-1, pp. 7-8). Pursuant to an IDOC Administrative Directive, inmates are required to have a bi-annual "birthday" dental exam (Doc. 144-7, p. 12).

Heard underwent a bi-annual dental exam with Dr. J.W. Mitchell at Pontiac on January 17, 2011 (Doc. 144-3, p. 6). There is no indication that Heard made any complaints regarding pain or swelling in his jaw during this exam. Soon thereafter, however, he began experiencing pain in the right side of his jaw (Doc. 141-1, p. 10). Heard submitted a request to be seen by dental and was again examined by Dr. Mitchell on March 2, 2011 (Doc. 144-3, p. 9; Doc. 141-1, p. 13; *see* Doc. 144-2, p. 2). At this appointment, Heard complained of soreness in the right side of his mouth and indicated he experienced a lump in that area intermittently (Doc. 141-1, p. 14). Dr. Mitchell determined that Heard's complaints were due to a blocked salivary duct and prescribed an antibiotic (Amoxicillin) (Doc. 141-1, p. 15; Doc. 144-3, p. 10; *see* Doc. 144-4, p. 1).

Heard was seen for a follow-up visit with Dr. Mitchell on April 14, 2011 (Doc. 144-3, p. 10; *see* Doc. 144-2, p. 2). Because Heard still had a sore lump and possible salivary stone, Dr. Mitchell referred Heard to be seen by Dr. F.A. Craig, a visiting oral surgeon who provided consultations for IDOC inmates (Doc. 144-3, p. 10; *see* Doc. 144-4, p. 5).[2] Dr. Craig examined Heard on May 27, 2011, and noted Heard had a lump in the area associated with his parotid duct (*see* Doc. 144-4, p. 8). Dr. Craig suspected a salivary stone and ordered x-rays to confirm his assessment (*see id.*). Heard testified that Dr. Craig indicated the IDOC would not approve surgery to remove the stone (Doc. 141-1, p. 19). Heard underwent a mandibular series of x-rays that were reviewed by Dr. Mitchell and Dr. Craig on June 1, 2011 (Doc. 144-3, p. 11; *see* Doc. 144-4, p. 7). The x-rays revealed there was no fracture or acute bony abnormality, and no abnormal calcification

---

[2] Dr. Craig is not a defendant in this matter.

was seen (*see* Doc. 144-4, p. 7). It was further noted that if the salivary gland stone was still of clinical concern, a CT could be performed (*see id.*). It is undisputed that no CT was recommended, ordered, or performed.

Dr. Mitchell and Dr. Craig had a "group consult" with Dr. Andrew Tilden, the medical director at Pontiac (Doc. 144-2, p. 2; 144-3, p. 11). It was determined that Heard would follow up with Dr. Tilden, and this occurred on June 2, 2011 (Doc. 144-2, p. 2; 144-3, p. 11; Doc. 144-4, p. 9). According to Dr. Tilden, the primary reason for this examination was to address another condition, H. Pylori;[3] however, Heard also complained at that time of pain in his right jaw, which Dr. Tilden assessed as a minor salivary duct stone (Doc. 144-5, p. 5; *see* Doc. 144-4, p. 9). Heard asserts that he told Dr. Tilden that the pain and swelling in his jaw had returned and that he had previously been treated with antibiotics and pain medication (Doc. 141-1, pp. 21-22). Heard testified that Dr. Tilden advised him the IDOC did not allow surgery for duct stones and told Heard it would go away on its own (Doc. 141-1, p. 22). Dr. Tilden prescribed a number of antibiotics that were "a hundred percent prescription for H. Pylori treatment, but just happened . . . [to treat the] salivary gland" (Doc. 144-5, p. 6). Dr. Tilden indicated he did not consider referring Heard for a consult with a specialist (an ENT) at this time despite Heard's recurrent complaints, because the stone was so small and the x-rays did not reflect any acute changes (Doc. 144-5, pp. 8-9). Heard was to return in two months for a follow-up exam, but an appointment was not scheduled due to an impending institutional transfer (which did not take place until October 2011) (Doc. 144-5, p. 6; Doc.

---

[3] H. Pylori is a bacteria that causes peptic ulcers in the stomach. Natl. Library of Medicine, MedlinePlus, *H. Pylori*, https://medlineplus.gov/helicobacterpyloriinfections.html (last visited June 1, 2017).

144-3, p. 12; *see* Doc. 144-2, p. 2; Doc. 144-4, p. 9). Heard saw Dr. Tilden at the chronic care clinic for his hypertension on August 26, 2011, however, and he did not mention any pain or swelling in his mouth (Doc. 144-5, p. 10; *see* Doc. 144-4, p. 10). In fact, Heard testified that his dental symptoms abated until approximately October 2011, one week after he was transferred from Pontiac to Pinckneyville (Doc. 141-1, pp. 26-27).

During his nurse intake interview at Pinckneyville on October 19, 2011, Heard made no mention of any complaints related to pain or swelling in his mouth (*see* Doc. 144-4, pp. 12-13). Dr. Nathan Chapman, the Pinckneyville dentist, performed a routine jacket review of Heard's medical and dental records on October 20, 2011 (Doc. 144-7, p. 8; *see* Doc. 144-2, p. 2). During his review, Dr. Chapman saw that Heard was diagnosed with a salivary duct stone at Pontiac, that he was subsequently referred to an oral surgeon, and that Heard had x-rays taken, which revealed no abnormalities (Doc. 144-7, p. 8). Dr. Chapman did not consider examining Heard at this time, finding no need based on his chart review (*Id.* at p. 9). Heard was to be seen upon request (*Id.*).

Heard did not see a dentist at Pinckneyville for approximately sixteen months—until his bi-annual exam on February 18, 2013 (Doc. 141-1, p. 35; *see* Doc. 144-2, p. 2). Heard testified, however, that from the date of his transfer to Pinckneyville in October 2011, until his examination in February 2013, he submitted four requests to be seen by dental (Doc. 141-1, p. 35). Specifically, Heard testified that on four separate occasions he placed sick call request slips into the healthcare box indicating his name and inmate number, and explaining that he was experiencing pain and swelling in his right jaw (*Id.* at pp. 35, 105). Also, in August 2012, Heard saw Defendant Dave Hess, his

assigned counselor at the time, and asked for a grievance form (*Id.* at p. 104). Heard told Counselor Hess that he had submitted four request slips to see the dentist because he was having pain and had been diagnosed with a salivary duct stone while he was at Pontiac (*Id.* at p. 102). Counselor Hess remarked that it takes a year to be seen in dental, and he never provided Heard with a grievance form (*Id.* at p. 104). Heard accepted Counselor Hess's advice that it takes a year to see the dentist and did not "push the issue" (*Id.*).

From November 2011 to November 2012, Heard was regularly seen in the chronic illness clinic to address his hypertension (*see* Doc. 144-4, pp. 13-17). Of particular note is his visit on November 13, 2012, during which Heard complained to Dr. Vipin Shah about a lump on his neck (Doc. 141-1, p. 30). Dr. Shah noted some swelling on the right lateral portion of Heard's neck and determined it was caused by a chronic infection (Doc. 144-6, p. 9; *see* Doc. 144-4, p. 17). Heard testified that Dr. Shah did not provide any treatment to address the lumps in his neck and indicated that Dr. Shah told him there was nothing he could do to address his complaint because that was not the purpose of his examination; Dr. Shah advised Heard to put in for nurse sick call (Doc. 141-1, p. 29). The medical records indicate, however, that Dr. Shah prescribed Bactrim DS, a broad-spectrum antibiotic, to treat Heard's suspected infection (Doc. 144-4, p. 17; Doc. 144-6, p. 10). Dr. Shah did not find it necessary to follow up, because he was not seeing Heard for swelling in his neck (or, as characterized by Dr. Shah, swollen lymph nodes), and it was merely an incidental finding in the clinic (*Id.*). Consequently, Dr. Shah believed it was Heard's responsibility to follow up (*Id.*).

Heard presented at nurse sick call on January 17, 2013, to again complain about a lump on his neck (*see* Doc. 144-4, p. 18). The nurse noted Heard had a lump on the side of his neck at his jawline, it was painful when touched, and it had increased in size within the last three months (*Id.*). Heard was referred to a physician, and he saw Dr. Shah the following day (Doc. 141-1, p. 33; *see* Doc. 144-4, p. 19). At this examination, Heard explained that he was experiencing pain and swelling in his jaw and asked whether the salivary duct stone he had previously been diagnosed with could be causing the infection and swelling in his neck (Doc. 141-1, p. 33). According to Heard, Dr. Shah then looked in his nose and said he had a staph infection (*Id.*). Dr. Shah ordered a battery of blood tests to try and determine what was causing Heard's lymph nodes to swell (Doc. 141-1, p. 33; Doc. 144-6, p. 11; *see* Doc. 144-4, p. 19). It is not clear when, or if, the blood tests were conducted or what the blood tests revealed.

One month later, on February 18, 2013, Heard was taken for his bi-annual dental exam with Dr. Chapman at Pinckneyville (Doc. 141-1, p. 37; *see* Doc. 144-2, p. 2). During this examination, Heard indicated he experienced swelling in his lower right premolar area within the last month (Doc. 144-7, p. 12; *see* Doc. 144-2, p. 2). Heard also indicated he had been sending requests to see dental, but had not received any response (Doc. 144-7, pp. 12–13; *see* Doc. 144-2, p. 2). Upon examination, Dr. Chapman noted teeth number 28 and 29 were loose and that Heard had a large cyst in his mouth (Doc. 141-1, p. 37; Doc. 144-7, p. 12). Dr. Chapman scheduled Heard to have x-rays taken on February 20, 2013 (Doc. 144-7, p. 13; *see* Doc. 144-2, p. 3). The x-rays revealed a large cyst in Heard's

mandible, and Dr. Chapman suspected it may be an ameloblastoma (Doc. 144-7, p. 13).[4]

Dr. Chapman submitted an urgent request for Heard to be seen by Dr. Jay Swanson, an

oral surgeon, for a biopsy of his cyst and a panoramic x-ray (Doc. 144-4, p. 20). The

referral was approved, and Heard was seen by Dr. Swanson on February 28, 2013 (Doc.

141-1, p. 41; *see* Doc. 144-4, pp. 21-22). Dr. Swanson performed a biopsy on March 6, 2013,

and according to Heard, the doctor extracted a number of his teeth, as well as a portion

of his jaw (Doc. 141-1, p. 43). Dr. Swanson performed a second surgery to remove

additional teeth and bone on June 26, 2013 (*Id.* at pp. 57-60). Heard underwent

reconstructive surgery for his jaw in October 2013 (*Id.* at pp. 62-65). Dr. Chapman

provided a more detailed account and said Heard had to have multiple teeth removed, a

titanium plate inserted in his jaw, and multiple bone regrowth surgeries to implant bone

to restructure and regrow his jaw (Doc. 144-7, p. 14). After the bone had regrown, Heard

was approved to have four dental implants placed in his mandible, which will take six to

eight months to heal (*Id.*). Then Heard will get posts screwed onto the implants and a

dental prosthesis that snaps onto the posts so that he will be able to chew food (*Id.*).

    In February 2014, while still recovering from reconstructive surgery in

Pinckneyville's infirmary, Heard complained to Dr. Shah about a recurrent knot in his

breast (Doc. 141-1, p. 77; *see* Doc. 144-4, p. 31). Dr. Shah asked Heard what medications

---

[4] Dr. Chapman describes an ameloblastoma as an abnormal growth in the mandible that can be highly aggressive and eat away at an individual's jaw bone if left untreated (Doc. 144-7, p. 8). Dr. Chapman testified that these tumors can "be very harmful" (*Id.*). According to the Mayo Clinic, an ameloblastoma is a noncancerous tumor that develops most often in the jaw, "can be very aggressive, growing into the jawbone and causing swelling and pain . . . [and] can spread to other areas of the body, such as the lymph nodes in the neck and the lungs." Mayo Clinic, *Ameloblastoma*, http://www.mayoclinic.org/diseases-conditions/ameloblastoma/home/ovc-20186225 (last visited June 1, 2017).

he was taking and indicated that some of his medications may cause gynecomastia (Doc. 141-1, p. 77). Dr. Shah then changed some of Heard's medications and ordered thyroid testing (Doc. 141-1, pp. 79-80; Doc. 144-6, p. 14). When Heard again complained about the knot and advised Dr. Shah it was still painful, the doctor told him it would go away (Doc. 141-1, p. 85). At the time of Heard's deposition on February 19, 2016, he testified that the symptoms of his gynecomastia had not abated, and the last time he spoke to Dr. Shah about the condition was between June and August 2014 (Doc. 141-1, p. 87). Dr. Shah testified that Heard's gynecomastia, swollen lymph nodes, and ameloblastoma were not related (Doc. 144-6, pp. 11, 16).

LEGAL STANDARDS

The standard applied to summary judgment motions under Federal Rule of Civil Procedure 56 is well-settled and has been succinctly stated as follows:

> Summary judgment is appropriate where the admissible evidence shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. A "material fact" is one identified by the substantive law as affecting the outcome of the suit. A "genuine issue" exists with respect to any such material fact . . . when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." On the other hand, where the factual record taken as a whole could *not* lead a rational trier of fact to find for the non-moving party, there is nothing for a jury to do. In determining whether a genuine issue of material fact exists, we view the record in the light most favorable to the nonmoving party.

*Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 681 (7th Cir. 2014) (citations omitted).

## Eighth Amendment Deliberate Indifference

The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the

Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In order to prevail on a claim for deliberate indifference to a serious medical need, there are "two high hurdles, which every inmate-plaintiff must clear." *Dunigan ex rel. Nyman v. Winnebago Cnty.*, 165 F.3d 587, 590 (7th Cir. 1999). First, the plaintiff must demonstrate that his medical condition was "objectively, sufficiently serious." *Greeno v. Daley*, 414 F.3d 645, 652-653 (7th Cir. 2005) (citations and quotation marks omitted). Second, a plaintiff must demonstrate that the "prison officials acted with a sufficiently culpable state of mind," namely deliberate indifference. *Greeno*, 414 F.3d at 653.

Here, there is no dispute that Heard's ameloblastoma and gynecomastia constitute objectively serious medical conditions (*see* Docs. 136, 143), so the Court will assume they were for the purpose of this Order. Thus, the only question for the Court is whether the defendants acted with deliberate indifference with respect to Heard's conditions.

In order to show that prison officials acted with a sufficiently culpable state of mind, a plaintiff must put forth evidence that the prison officials knew that the prisoner's medical condition posed a serious health risk, but they consciously disregarded that risk. *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). "This subjective standard requires more than negligence and it approaches intentional wrongdoing." *Id.*; *accord Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) ("Deliberate indifference is intentional or reckless conduct, not mere negligence."); *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("[N]egligence, even gross negligence does not violate the Constitution."). A plaintiff does not have to prove that

his complaints were "literally ignored," but only that "the defendants' responses were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008) (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)).

DISCUSSION

The Court will consider in turn whether each defendant acted with deliberate indifference.[5]  First up are the medical providers—Dr. Mitchell, Dr. Tilden, Dr. Shah, and Dr. Chapman—followed by Counselor Hess.

## 1.  Dr. J. W. Mitchell

Dr. Mitchell was a dentist at Pontiac at all times relevant to this suit. The evidence viewed in Heard's favor establishes that Dr. Mitchell examined Heard on March 2, 2011, to assess a lump and soreness in the right side of Heard's mouth. Following the examination, Dr. Mitchell diagnosed Heard with a blocked salivary duct and prescribed antibiotics. Dr. Mitchell conducted a follow-up exam approximately six weeks later on April 14, 2011, and Heard presented with similar symptoms. At that point, Dr. Mitchell referred Heard to an oral surgeon. The oral surgeon, Dr. Craig, saw Heard on May 27, 2011, and he suspected a salivary duct stone, which is consistent with Dr. Mitchell's diagnosis, and he and ordered x-rays to confirm his suspicion. After Dr. Craig and Dr. Mitchell reviewed the x-rays and consulted with one another, Heard was referred to Dr.

---

[5]  The motion by the Wexford defendants does not set forth separate arguments for each defendant; rather, these defendants set forth the facts of the case and general case law, and then in their "argument" section merely re-state many of the facts. In other words, the "argument" section lacks any actual legal argument. Despite this obvious failing, Heard addressed the actions of each defendant in his response and set forth the evidence he argues supports a finding of deliberate indifference. Thus, the Court's analysis concerning each defendant focuses on the evidence relied on by Heard in his response to the motion.

Andrew Tilden, the medical director at Pontiac. Dr. Mitchell provided no other treatment to Heard prior to his transfer to Pinckneyville in October 2011.

Heard argues summary judgment is not appropriate as to Dr. Mitchell due to his failure to obtain or order a CT scan despite the x-ray report from June 2011 indicating that a CT could be performed if the salivary duct stone was still of clinical concern. The Court disagrees.

While Heard clearly disagrees with Dr. Mitchell's course of treatment, it is well-established that a prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment was "blatantly inappropriate." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (citing *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005)). "[F]ederal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment. *Pyles*, 771 F.3d at 409 (citations omitted). *See also Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) ("A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances.") (citation omitted).

Although the evidence clearly indicates a CT scan *could* have been performed, there is no evidence for a reasonable jury to conclude that Dr. Mitchell's failure to order the test amounted to deliberate indifference to a known or obvious risk. First, "the decision to forego diagnostic tests is 'a classic example of a matter for medical

judgment.'" *Pyles*, 771 F.3d at 411 (quoting *Estelle v. Gamble*, 429 U.S. 97, 107 (1976)). In this instance, Dr. Mitchell's opinion that a CT scan was not needed was shared by both Dr. Craig and Dr. Tilden (*see* Doc. 144-3, p. 11; Doc. 144-5, p. 5). There also is no evidence indicating that Dr. Mitchell's failure to order a CT scan caused, or could have caused, any injury to Heard. Although Heard seems to suggest Dr. Mitchell's failure could have delayed diagnosis of his ameloblastoma, there is simply no evidence in the record to support such an inference. Indeed, each medical professional testified that he could not discern when Heard's ameloblastoma began developing, noting only that these types of tumors are very "aggressive" (*see* Doc. 144-7, p. 17). The Court also rejects any inference that a CT could have detected an ameloblastoma when an x-ray could not, because Dr. Chapman indicated that these types of tumors are commonly diagnosed by x-rays.

Based on the foregoing, the Court finds Defendant Dr. Mitchell is entitled to judgment as a matter of law on Heard's claim of deliberate indifference.

## 2. Dr. Andrew Tilden

When viewed in Heard's favor, the evidence establishes Defendant Dr. Tilden, the medical director at Pontiac, assessed Heard's jaw complaints on one occasion, June 2, 2011. During this examination (which Dr. Tilden asserts was primarily to address Heard's H. Pylori), Heard advised the doctor that he was experiencing recurring pain and swelling in his jaw that had previously been treated with antibiotics and pain medication. Dr. Tilden determined Heard was suffering from a minor salivary duct stone, which was consistent with the medical diagnoses of Dr. Mitchell and Dr. Craig, and prescribed antibiotics. Dr. Tilden explained that although the antibiotics were

intended to treat Heard's H. Pylori, they would have been sufficient to address any infection related to his salivary gland. Heard was to return in two months for a follow-up exam. It is undisputed that no follow-up exam occurred, and Heard was transferred to Pinckneyville approximately four months later. Heard did see Dr. Tilden, however, within that time period for a chronic illness appointment.

Heard contends that Dr. Tilden's failure to perform a follow-up exam in August 2011, his failure to order a CT, and his failure to refer him for surgery to remove the salivary duct stone are sufficient to support a finding of deliberate indifference. Once again, the Court disagrees.

The evidence, even when viewed in Heard's favor, does not establish that Dr. Tilden's actions were "blatantly inappropriate." For the same reasons stated above with respect to Dr. Mitchell, there is no evidence that Dr. Tilden's decision to forego any CT testing was made without reasoned medical judgment or caused Heard any injury.

The Court also finds Heard's argument concerning Dr. Tilden's failure to follow up with him in August 2011 unavailing. First, Heard testified that after Dr. Tilden prescribed him antibiotics in June 2011, his symptoms (pain and swelling in his jaw) abated until October 2011. Accordingly, it is unclear what a follow-up exam would have revealed. Moreover, Heard saw Dr. Tilden in August 2011 for management of his hypertension. While it is undisputed that Dr. Tilden did not address Heard's jaw condition at this examination, it is also undisputed that Heard did not complain about his jaw condition. Management of a health condition should most certainly be ascribed to both the patient and the physician. Finally, Heard's argument that Dr. Tilden's failure

to refer him for surgery to remove the salivary duct stone is a non-starter because Heard's claim against Dr. Tilden is not premised on his failure to adequately treat his salivary duct condition. The Court also notes that even if it considered this condition to be at issue in this lawsuit, there is no evidence that surgical removal was warranted, because Heard testified that his pain and swelling had resolved until October 2011.

Based on the foregoing, the Court finds Defendant Dr. Tilden is entitled to judgment as a matter of law on Heard's claim of deliberate indifference.

## 3. Dr. Vipin Shah

The evidence viewed in Heard's favor establishes that Defendant Dr. Shah, the medical director at Pinckneyville, first saw Heard on November 13, 2012. Dr. Shah saw Heard at the chronic illness clinic to manage his hypertension; however, at this exam Heard complained about a lump on his neck. Although disputed by Dr. Shah, Heard asserts Dr. Shah did not address the complaints regarding his neck and merely advised Heard to submit a nurse sick call request. Heard apparently submitted a request and was seen at nurse sick call on January 17, 2013, complaining again about the knot in his neck. Heard was referred to a physician and seen by Dr. Shah on January 18, 2013. Heard explained that he was experiencing pain and swelling in his jaw. Dr. Shah looked in Heard's nose and indicated he had a staph infection. Dr. Shah also ordered a battery of blood tests, but there is no indication when the tests were completed or what, if anything, they revealed. One month later, on February 18, 2013, Heard saw the dentist, Defendant Dr. Chapman, and was diagnosed with an ameloblastoma.

Subsequently, in February 2014, Heard complained to Dr. Shah about a recurrent knot in his breast. Dr. Shah diagnosed Heard with gynecomastia and attributed its development to medications he was taking. Based on this diagnosis, Dr. Shah changed some of Heard's medications and ordered thyroid testing. There is no evidence as to what the lab testing revealed. As of February 2016, Heard's gynecomastia had not resolved.

In light of the foregoing, Heard asserts that there is sufficient evidence to support a finding that Dr. Shah was deliberately indifferent Heard's medical needs. The Court agrees.

As set forth above, while a prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment was "blatantly inappropriate," the Seventh Circuit also recognizes that a physician, in exercising his professional judgment, must make decisions that are fact-based with respect to the particular inmate, the severity and stage of his condition, the likelihood and imminence of further harm, and the efficacy of available treatments. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (citing *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005)); *Roe v. Elyea*, 631 F.3d 843, 860 (7th Cir. 2011) (citing *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998) ("A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances.")).

When viewing the evidence before the Court in the light most favorable to Heard, the Court finds there is a question of fact as to whether Dr. Shah exercised his professional judgment in addressing Heard's complaints of lumps both in his neck and in his breast and pain in his jaw. Although Dr. Shah opined that the lumps in Heard's neck (or swollen lymph nodes, as characterized by Dr. Shah) were not related to his dental issues, he did not provide any explanation as to why or how he reached that opinion, and there is no other evidence to support his assertion (*see* Doc. 144-6, p. 11). Furthermore, the temporal and physical proximity between Heard's ongoing neck complaints and a subsequent finding of an apparently significant and large ameloblastoma in his jaw creates a question of fact as to whether Dr. Shah was deliberately indifferent in failing to adequately evaluate Heard's complaints. And, although no medical provider offered a timeline for the development of Heard's ameloblastoma, there is no evidence that Heard's ameloblastoma developed *after* his January 2013 exam with Dr. Shah. Finally, the seemingly cursory diagnosis of Heard's gynecomastia that remained unresolved despite Dr. Shah's prescribed course of treatment (i.e., a change of prescription medications) creates a question of fact as to whether Dr. exercised his professional judgment in diagnosing and treating this condition. Accordingly, Dr. Shah is not entitled to judgment as a matter of law.

### 4. Dr. Nathan Chapman

With regard to Dr. Chapman, the dentist at Pinckneyville at all relevant times, the evidence viewed in Heard's favor indicates that this doctor reviewed Heard's dental and medical records shortly after his transfer to Pinckneyville in late October 2011. Despite seeing Heard's recent diagnosis of a salivary duct stone and finding no indication that a follow-up exam had been completed, Dr. Chapman determined Heard did not need to be examined and would be seen on request. The basis for this determination was the facts that Heard had been referred to an oral surgeon, he had x-rays taken that revealed no abnormalities, and he had received antibiotics. Dr. Chapman did not see Heard again until February 18, 2013, for his bi-annual exam. Although Heard submitted four requests to be seen by dental after his transfer to Pinckneyville in October 2011, there is no evidence that Dr. Chapman ever received any of these requests (Heard makes an argument to the contrary, but he has not pointed to any evidence for support).

Following the exam on February 18, 2013, Dr. Chapman ordered x-rays, which were taken two days later, and upon review of these x-rays, he urgently referred Heard to an oral surgeon for a biopsy of his suspected ameloblastoma. Upon Heard's initial consultation with Dr. Swanson (the oral surgeon), he underwent his first procedure on March 6, 2013. It appears that Dr. Swanson took over the primary treatment and management of Heard's ameloblastoma after that consultation in March 2013, however, Dr. Chapman managed Heard's recovery.

Heard asserts that Dr. Chapman's actions amount to deliberate indifference, but the Court disagrees. First, the Court considers Dr. Chapman's decision to only see Heard

upon request, rather than scheduling him for an examination immediately following his transfer to Pinckneyville. As set forth above with regard to Dr. Tilden, there is no evidence that Dr. Chapman's decision to forego an immediate exam and CT testing was made without reasoned medical judgment. Further, there is no evidence to indicate that these decisions caused or could have caused Heard any injury. Although Heard seems to infer Dr. Chapman's failure could have delayed diagnosis of his ameloblastoma, as mentioned above, there is simply no evidence in the record to support such an inference. Moreover, the Court finds Dr. Chapman acted reasonably and within the bounds of his medical judgment in assessing whether immediate follow up or additional testing was necessary with regard to the diagnosis of Heard's salivary duct stone.

The Court also finds no evidence for a reasonable jury to conclude that Dr. Chapman received, and then ignored, the dental requests submitted by Heard. Although it is noted in Heard's dental records that he told Dr. Chapman on February 18, 2013, that he had submitted requests, the submission of requests is certainly not tantamount to receipt.

Finally, the Court considers Heard's complaint that Dr. Chapman failed to provide gauze for him following the March 6, 2013, procedure that caused him to develop a painful dry socket. This oversight, even if attributable to Dr. Chapman, does not amount to deliberate or reckless conduct and, accordingly, no reasonable jury could find that Dr. Chapman was deliberately indifferent.

**5. Counselor David Hess**

The evidence viewed in Heard's favor establishes that Defendant Hess, Heard's counselor at all relevant times, spoke with Heard in August 2012 regarding his dental care (or lack thereof). Specifically, Heard told Hess that he had submitted four request slips to see the dentist because he was having pain and had been diagnosed with a salivary duct stone while he was at Pontiac. Heard asked Hess for a grievance form. Hess advised Heard it takes a year to see dental. Hess did not provide Heard with a grievance form, and Heard accepted Hess's instruction that it would take a year to see dental and did not "push the issue." Approximately six months later, Heard saw Dr. Chapman and was diagnosed with an ameloblastoma.

Hess contends summary judgment is appropriate because there is no evidence to show he knew Heard had a cancerous tumor in his jaw and deliberately failed to take steps to get him dental care. This argument is unavailing.

While it is well-settled that a non-medical prison official will generally be justified in believing that a prisoner is in capable hands if he is under the care of medical experts, thereby relieving the official of liability for the care, the limitation on liability is only available if the non-medical prison official does not ignore the prisoner's complaints entirely. *See Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008); *see also Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005).

In this instance, a reasonable jury could find that Heard notified Hess of a serious medical condition, advised Hess that he was not in the "capable hands" of medical experts, and that despite this knowledge, Hess failed to take any steps to ensure Heard's

medical condition was appropriately addressed. While Hess contends that summary judgment is appropriate because he only knew Heard had pain in his jaw (because there was no tumor detected until February 2013), this argument does not affect the Court's finding. First, it is of no consequence that Heard only complained of pain rather than a tumor in his jaw. Dr. Chapman's testimony indicated that any dental request citing pain or swelling is addressed immediately and the inmate would be seen within the next working day. While Hess is certainly not held to this particular policy, the Court finds it instructive that complaints of pain are addressed on an urgent basis by the dental unit. Moreover, pain in and of itself is a basis for a serious medical need. *See Ray v. Wexford Health Sources, Inc.*, 706 F.3d 864, 866 (7th Cir. 2013). Finally, Hess's reliance on the late date of Heard's tumor detection is fairly ironic insofar as it is entirely possible that it would have been detected earlier if he had acted appropriately, or at all, after being notified of Heard's complaint. The fact that there is no evidence that any delay attributable to Hess exacerbated Heard's condition again misses the mark, because Hess's failure to address Heard's complaints of jaw pain and take *any* action creates a genuine dispute of a material issue of fact for the jury.

Further, Hess is not entitled to qualified immunity; it is clearly established law that a serious medical need arises when the failure to treat a prisoner "could result in further significant injury or the unnecessary and wanton infliction of pain." *Hayes*, 546 F.3d at 522; *see also Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997). Because a jury could find that Hess's failure to further ensure Heard was in the hands of capable medical personnel led to the wanton and unnecessary infliction of pain, in violation of

Heard's Eighth Amendment rights, Defendant Hess is not entitled to qualified immunity.

CONCLUSION

For the reasons set forth above, the Motion for Summary Judgment filed by Dr. Hess (Doc. 136) is **DENIED,** and the Motion for Summary Judgment filed by Defendants Shah, Chapman, Tilden, Mitchell, and Bullock (Doc. 143) is **GRANTED in part, DENIED in part, and FOUND MOOT in part**.

Heard's claim of deliberate indifference against Dr. Chapman, Tilden, and Mitchell is **DISMISSED with prejudice** and, in accordance with the Court's previous Order, Heard's claim of deliberate indifference against Dr. Bullock is **DISMISSED without prejudice**. The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendants Chapman, Tilden, and Mitchell and against Heard at the close of this case.

The only remaining claim is a deliberate indifference claim against Defendants Hess and Shah. Jury trial is scheduled to begin at 9 a.m. on **Tuesday, July 18, 2017**. A final pretrial conference will be held at 1:30 p.m. on **Wednesday, July 5, 2017**. The parties shall immediately contact Magistrate Judge Wilkerson to schedule a settlement conference to be held before the final pretrial conference.

**IT IS SO ORDERED.**

**DATED:   June 6, 2017**

**NANCY J. ROSENSTENGEL**
**United States District Judge**